[Cite as *State v. Fite*, 2011-Ohio-2500.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

STATE OF OHIO

    Appellee

    v.

STEVEN L. FITE

    Appellant

C.A. No.      25318

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.     CR 09 08 2464

DECISION AND JOURNAL ENTRY

Dated: May 25, 2011

---

DICKINSON, Judge.

## INTRODUCTION

{¶1} Someone shot Bernard Rones. A jury convicted Steven Fite of felonious assault with a firearm specification, improperly discharging a firearm at or into a habitation or school, and having weapons under disability. We affirm the trial court's judgment because it did not err in admitting statements made by Mr. Fite to a detective at a bar or statements made by Mr. Fite's brother, it did not commit plain error by failing to recite all the instructions in Rule 24(J) of the Ohio Rules of Criminal Procedure, and his convictions are not against the manifest weight of the evidence.

## BACKGROUND

{¶2} Mr. Rones and Monkia Travis are the parents of a young girl. Ms. Travis also has two sons whom Mr. Rones sometimes cares for. Mr. Rones, accompanied by Ms. Travis's sons, went to her house one morning to pick up his daughter. Ms. Travis took a while to open the

door, and Mr. Rones asked her why. He saw Mr. Fite, who he said he knew only as "Steve-O," sitting on a love seat and repeated his question to Ms. Travis.

{¶3} According to Mr. Rones, Mr. Fite then mumbled something, and Mr. Rones responded that he was not talking to him. Mr. Fite stood up as if to walk out the door, mumbled something else, and Mr. Rones punched him. The two men fought, and Mr. Rones' daughter ran outside screaming. Mr. Fite pushed Mr. Rones away and moved outside, challenging Mr. Rones to follow.

{¶4} Mr. Rones testified that he told his daughter to join her brothers in his car. Meanwhile, Mr. Fite retreated to his car, which Mr. Rones described as a "'95, '96 Cadillac sedan, gray in color." Mr. Rones got in his own car and drove away to take the children to camp. According to Mr. Rones, Mr. Fite yelled at him that he knew where he lived. Mr. Fite, however, named a street where Mr. Rones had formerly lived.

{¶5} After Mr. Rones dropped the children off at camp, he went home and called his brother to tell him about the fight. He looked out his front door and saw "Steve-O and the Cadillac" driving down his street. According to Mr. Rones, he shut his front door as Mr. Fite exited his car. After he had shut the door, he heard a gun shot and a bullet came through his wall. A second shot struck him. He testified that, after he had been shot, four more bullets came through his window.

{¶6} Mr. Rones' neighbor, Lisa Little, testified that she was starting to walk out her door when she heard gunshots. She closed the door and called 9-1-1. Through her window, she saw a car, which she described as a beige Cadillac or Lincoln, speeding down the street.

{¶7} Officer Troy Looney was the first officer to respond. He testified that he spoke with Mr. Rones while they waited for an ambulance. According to Officer Looney, Mr. Rones

told him to contact Ms. Travis because she knew the shooter. Officer Looney also testified that Mr. Rones told him that the shooter's name was Steven Wheeler, which Mr. Rones denied.

{¶8} The paramedics came and took Mr. Rones to the hospital. Detective John Bell went to the hospital to interview him. Mr. Rones told Detective Bell that "Steve-O" had shot him, and gave Detective Bell a physical description of the shooter. Detective Bell testified that he investigated the Steven Wheeler lead but determined that he did not match the physical description of the shooter. Because the suspect's name was "Steve-O," Detective Bell checked to determine whether a man named Steven O'Neil matched the description.

{¶9} Before he pursued the Steven O'Neil lead too far, however, another detective working the case informed Detective Bell that they may have a suspect. Sergeant Alan Fite, Mr. Fite's brother, had seen the physical description given to the patrolmen before going on their patrol. He had contacted the other detective and told him that it sounded like it could be his brother, Steven Fite.

{¶10} Based on this information, the police prepared a photo array with Mr. Fite's picture in it, and Detective Bell showed it to Mr. Rones at the hospital. Mr. Rones identified Mr. Fite as the shooter.

MR. FITE'S STATEMENTS

{¶11} Mr. Fite's second assignment of error is that the trial court incorrectly allowed Detective Bell to testify about statements Mr. Fite made to him at a bar approximately a month before his trial. Detective Bell testified that he was out at a bar when he noticed a man staring at him. He approached the man, who turned out to be Mr. Fite, and spoke to him briefly. He testified that they shook hands and that Mr. Fite said something like "I screwed up." According to Mr. Fite, this conversation violated his Sixth Amendment right to counsel.

{¶12} Detective Bell first reported the conversation to the prosecutor the day before trial. The prosecutor informed Mr. Fite's lawyer, who, because of the timing of the disclosure, did not move to suppress Mr. Fite's statement until the morning of the third day of the trial. The trial court denied the motion to suppress, determining that Mr. Fite's comments were unsolicited and, therefore, not a violation of his constitutional rights.

{¶13} Mr. Fite has argued that this Court should apply the rules established in *Edwards v. Arizona*, 451 U.S. 477 (1981), to this assigned error. As the State has correctly pointed out, however, *Edwards* only applies to custodial interrogations. *Id.* at 484. Mr. Fite has not argued that this chance encounter at a bar was a custodial interrogation, and it is unlikely that it could be found to have been one.

{¶14} Mr. Fite, however, had been indicted and had retained counsel at the time of the bar conversation. "[O]nce the adversary judicial process has been initiated, the Sixth Amendment guarantees a defendant the right to have counsel present at all 'critical' stages of the criminal proceedings." *Montejo v. Louisiana*, ___ U.S. ___, 129 S. Ct. 2079, 2085 (2009). "The cases have defined critical stages as proceedings between an individual and agents of the State (whether 'formal or informal, in court or out, . . .') that amount to 'trial-like confrontations,' at which counsel would help the accused 'in coping with legal problems or . . . meeting his adversary[.]'" *Rothgery v. Gillespie County, Tex.*, 554 U.S. 191, fn. 16 (quoting *United States v. Wade*, 388 U.S. 218, 226 (1967); *United States v. Ash*, 413 U.S. 300, 312-13 (1973)).

{¶15} There is no doubt the "adversary judicial process" had begun, implicating Mr. Fite's Sixth Amendment "right to rely on counsel as a 'medium' between him and the State." *Maine v. Moulton*, 474 U.S. 159, 176 (1985). Once Mr. Fite had invoked his Sixth Amendment right to counsel, the State had an "affirmative obligation" to not attempt to circumvent the

protections it affords. *Id.* While this does not prohibit the State from using statements obtained through "luck or happenstance[,] . . . [the] knowing exploitation by the State of an opportunity to confront the accused without counsel being present is as much a breach of the State's obligation not to circumvent the right to the assistance of counsel as is the intentional creation of such an opportunity." *Id.*

{¶16} The United States Supreme Court has emphasized that it is the deliberate act of eliciting information from the defendant that violates the Sixth Amendment. See *Maine v. Moulton*, 474 U.S. 159, 176 (1985) (holding that a cooperating codefendant asking the defendant questions while wearing a wire violated the defendant's Sixth Amendment Right); *Massiah v. United States*, 377 U.S. 201, 207 (1964) (holding that a government agent listening to a conversation via recording equipment in a cooperating codefendant's vehicle violated Massiah's Sixth Amendment right to assistance of counsel). Detective Bell testified that he had no intention of eliciting information from Mr. Fite. He said that he saw Mr. Fite in a bar and recognized him from some previous cases and through his brother, Sergeant Fite, with whom Detective Bell had worked.

{¶17} Detective Bell admitted that he realized that Mr. Fite's case was pending and that Mr. Fite was represented by counsel. Despite this, he spoke to him. Detective Bell testified that he did not inquire about the case, but "was just giving him a cordial handshake, how's it going." According to Detective Bell, Mr. Fite then said something like "I've gotten myself in some trouble[.]"

{¶18} It is unclear from the record what was said and how it was said. Detective Bell, however, repeatedly testified that he had not solicited Mr. Fite's statement in any way. While the State has an "affirmative obligation" to preserve the defendant's right to counsel, it does not

have to ignore evidence obtained through luck or accident. A standard greeting of "how's it going," especially when asked outside a custodial situation, cannot be reasonably expected to induce inculpatory statements.

{¶19} While Detective Bell could have avoided any question of impropriety by not speaking to Mr. Fite, merely acknowledging a defendant does not equate to an attempt to deliberately elicit information from him. This Court cannot conclude that Detective Bell violated Mr. Fite's Sixth Amendment right to counsel by greeting him after Mr. Fite stared at him from across the room. Mr. Fite's second assignment of error is overruled

BROTHER'S STATEMENTS

{¶20} Mr. Fite's third assignment of error is that the trial court incorrectly admitted hearsay statements of his brother, Sergeant Fite, that Steven Fite matched the physical description of the shooter. He has argued that the trial court incorrectly determined that the statement was not hearsay because it was used to show that he matched the description of the shooter and that his brother thought that he was someone who should be a suspect in the shooting.

{¶21} "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid. R. 801(C). Under Rule 802 of the Ohio Rules of Evidence, "[h]earsay is not admissible except as otherwise provided by . . . these rules . . . ."

{¶22} On direct examination, Detective Bell made no mention of who had given the police the information that led them to Steven Fite. On cross examination, Mr. Fite's lawyer repeatedly questioned him regarding why the police did not follow up the Steven O'Neil and Steven Wheeler leads. Detective Bell responded that those men did not match the physical

description of the shooter given by Mr. Rones and reiterated that he had received information indicating Steven Fite did.

{¶23} On redirect, Detective Bell testified that Sergeant Fite had seen the physical description of the defendant and had told a detective that it sounded like his brother, Steven Fite. Sergeant Fite's statements were offered in response to the questions during cross examination regarding why the police had investigated Steven Fite instead of pursuing Steven O'Neil. They were not offered to prove that Mr. Fite met the physical description of the shooter, but to show why the police had decided that he was a suspect. Accordingly, they were not offered for the truth of the matter asserted and were not hearsay. Mr. Fite's third assignment of error is overruled.

MANIFEST WEIGHT

{¶24} Mr. Fite's first assignment of error is that his convictions are against the manifest weight of the evidence. When a defendant argues that his convictions are against the manifest weight of the evidence, we "must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction[s] must be reversed and a new trial ordered." *State v. Otten*, 33 Ohio App. 3d 339, 340 (1986).

{¶25} A jury convicted Mr. Fite of violating Sections 2903.11(A)(1)-(2) of the Ohio Revised Code by committing felonious assault, Section 2923.16.1(A)(1) of the Ohio Revised Code by firing into a habitation, and Section 2923.13(A)(3) of the Ohio Revised Code by having weapons while under a disability. Under Section 2903.11(A)(1)-(2), "no person shall knowingly . . . [c]ause serious physical harm to another . . . [or] [c]ause or attempt to cause physical harm to

another . . . by means of a deadly weapon or dangerous ordnance." Under Section 2923.16.1(A)(1), "[n]o person, without privilege to do so, shall knowingly . . . [d]ischarge a firearm at or into an occupied structure that is a permanent or temporary habitation of any individual[.]" Under Section 2923.13(A)(3), "[u]nless relieved from disability as provided in [S]ection 2923.14 of the [Ohio] Revised Code, no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if . . . [t]he person is under indictment for or has been convicted of any offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse[.]"

{¶26} Mr. Fite has not disputed that he had previously been convicted of possession of marijuana, that Mr. Rones was shot, or that shots were fired into Mr. Rones' home. Essentially, he has conceded each element of the gun specification, the firing into an occupied structure, and that he was under disability at the time. He, instead, has argued that the manifest weight of the evidence is against the jury's finding that he was the shooter.

{¶27} He has argued that Mr. Rones' testimony was full of discrepancies. In particular, he has pointed to the different names for the shooter that came out during the investigation. While Mr. Rones testified that he only ever identified the shooter as "Steve-O" and that he never knew Mr. Fite's last name, Officer Looney testified that Mr. Rones told him "Steven Wheeler," which Mr. Rones denied.

{¶28} Mr. Fite has also argued that his rivalry with Mr. Rones for Ms. Travis's affections, as well as the fight on the day Mr. Rones was shot, further undermined Mr. Rones' credibility, as Mr. Rones wanted to remove him as a romantic rival. In addition, he has argued that Mr. Rones could have identified him from the photo array merely because he knew him. His lawyer, however, raised all these issues before the jury. Further, Mr. Rones did identify Mr. Fite

at trial, saying that it was Mr. Fite that he saw exiting the car the morning he was shot. Detective Bell testified that Mr. Rones never hesitated in picking Mr. Fite as the shooter from the photo array. As a jury is in the best position to determine the credibility of a witness, this Court cannot conclude that the jury lost its way to the extent it believed Mr. Rones' testimony.

{¶29} Mr. Fite has argued that Mr. Rones and Ms. Little gave inconsistent statements to the police. Ms. Little testified that she saw a beige Cadillac or Lincoln driving away from the shooting. Mr. Rones testified that the car he saw Mr. Fite driving was a gray Cadillac. While there is a discrepancy regarding the color of the car, Mr. Rones and Ms. Little were consistent regarding the make of the car. Further, the jury was aware of the discrepancy and was able to weigh the evidence accordingly.

{¶30} Mr. Fite has pointed out that the State failed to present any physical evidence linking him to the shooting. While true, the State was not required to present physical evidence. The jury was aware that no physical evidence had been presented and were able to weigh that fact in reaching its verdict.

{¶31} Finally, Mr. Fite has argued that Detective Bell's testimony about his conversation at the bar should carry little weight. Mr. Rones testified that Mr. Fite was walking towards his house when he was shot. The reasonable inference from Mr. Rones' testimony is that Mr. Fite was the shooter. Regardless of the weight given to Mr. Fite's statement to Detective Bell, his statement only further corroborated the testimony of the other witnesses. This Court cannot conclude that the jury lost its way when it found that Mr. Fite shot Mr. Rones. His convictions for felonious assault, shooting into a habitation, and possession under disability are not against the manifest weight of the evidence. His first assignment of error is overruled.

JURY QUESTIONS

**{¶32}** Mr. Fite's fourth assignment of error is that the trial court failed to follow the rules for permitting jury questions. Whether to allow a jury to question witnesses is in the discretion of the trial court. *State v. Fisher*, 99 Ohio St. 3d 127, 2003-Ohio-2761, at syllabus. After *Fisher*, the Court adopted Rule 24(J) of the Ohio Rules of Criminal Procedure, setting forth procedures to "minimize the risk of prejudice" when a trial court permits jury questions.

**{¶33}** Rule 24(J) requires a trial court to have the jurors submit their questions in writing, to keep the written questions for the record, to instruct the jurors not to discuss their questions with other jurors, to allow counsel an opportunity to object to a proposed question before it is asked and to reexamine the witness after any questions are asked, and, "[i]f a question proposed by a juror is not asked, instruct the jurors that they should not draw any adverse inference from the court's refusal to ask any question proposed by a juror." Crim. R. 24(J).

**{¶34}** Before the trial began, the court informed the jurors that they would be permitted to ask each witness questions. It told the jury that the questions would be submitted anonymously and would only be asked after it reviewed the questions with the lawyers "to make sure there [are] no problems with me posing them to the witness."

**{¶35}** While it would be reasonable for a trial court to instruct the jury during its initial instructions not to draw any inferences from its failure to ask a proposed question, Rule 24(J)(7) of the Ohio Rules of Criminal Procedure only requires such an instruction if a proposed question is in fact not asked. Mr. Fite has not cited any instance in the record of a juror's question not being asked. Accordingly, we cannot conclude that the trial court erred by not instructing the jurors not to draw any inferences from its failure to ask a proposed question.

{¶36} The trial court did err by failing to instruct the jurors not to show or to discuss proposed questions with each other. Crim. R. 24(J)(3). Mr. Fite's lawyer, however, did not object to the trial court's instructions at trial. Accordingly, he has forfeited all but plain error. Crim. R. 52(B). Although Rule 52(B) of the Ohio Rules of Criminal Procedure permits appellate courts to take notice of plain errors, such notice is to be taken "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St. 2d 91, 97 (1978). To prevail on a claim of plain error, Mr. Fite would have to show that, "but for the error, the outcome of the trial clearly would have been otherwise." *State v. Murphy*, 91 Ohio St. 3d 516, 532 (2001) (quoting *State v. Campbell*, 69 Ohio St. 3d 38, 41 (1994)).

{¶37} Mr. Fite has not argued that any jurors showed or discussed proposed questions with each other, nor has he argued how, but for the trial court's failure to give the instruction, the outcome of his trial would have been different. Given the evidence presented, especially Mr. Rones' identification of Mr. Fite as the shooter, this Court cannot conclude that, but for the trial court's error, Mr. Fite would clearly not have been convicted. His fourth assignment of error is overruled.

CONCLUSION

{¶38} Mr. Fite's convictions for felonious assault with a gun specification, firing into a habitation, and having a weapon under disability are not against the manifest weight of the evidence. The trial court did not err by admitting Sergeant Fite's statements or Steven Fite's statements to Detective Bell. The trial court was not required to provide the jury the instruction contained in Rule 24(J)(7) of the Ohio Rules of Criminal Procedure because the duty only arises if a proposed question is not asked. Finally, while the trial court did commit an error by not

instructing the jurors not to show or to discuss their questions with each other, that error did not rise to the level of plain error requiring reversal of Mr. Fite's convictions. The judgment of the Summit County Common Pleas Court is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

CLAIR E. DICKINSON
FOR THE COURT

CARR, P. J.
WHITMORE, J.
CONCUR

APPEARANCES:

SCOT A. STEVENSON, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN R. DIMARTINO, Assistant Prosecuting Attorney, for Appellee.